## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: Richard Blackburn and Victoria Blackburn, <br><br> Debtor(s). <br><br>_____ <br><br> Marco J. Muscarello, individually and Marco J. Muscarello, derivatively on behalf of Eldercare Risk Management, Inc., <br> Plaintiff(s), <br> v. <br> Richard Blackburn and Victoria Blackburn, <br> Defendant(s). | Bankruptcy No.  07 B 05905 <br> Adversary No. 07 A 00796 <br> Chapter 13 <br> Judge Manuel Barbosa |

### MEMORANDUM OPINION

This matter comes before the Court on the objections to discharge filed by plaintiffs

Marco J. Muscarello, individually and Marco J. Muscarello, derivatively on behalf of Eldercare

Risk Management, Inc., ("Plaintiffs"), pursuant to 11 U.S.C. § 523(a)(4), (a)(6), on August 14,

2007.   Counsel for debtors Richard Blackburn and Victoria Blackburn ("Debtors") and Debtors'

valuation expert filed motions for compensation for post-petition services in representation of

Debtors in their adversary trial.  For the reasons set forth herein, the Court sustains Plaintiffs'

objections to discharge under § 523(a)(6) in Counts I and IV, and overrules Plaintiffs' objections

to discharge under § 523(a)(4) in Counts II, III and V.  Plaintiffs' compensatory damages are

$385,638.04.  In addition, Debtors' attorneys and valuation expert shall be afforded a priority

Chapter 7 administrative claim, pursuant to 11 U.S.C. §§ 503(b)(2), 507(a)(2), 726(a)(1), but

Debtors' attorneys and valuation expert are not entitled to immediate payment of their

administrative claim, and, instead, shall be paid by the Chapter 7 trustee, pursuant to 11 U.S.C. §

726(a)(1).

## JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide these matters pursuant to 28 U.S.C. § 1334 and

Internal Operating Procedure 15(a) of the United States District Court for the Northern District

of Illinois.  They are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(J).

## FACTS AND BACKGROUND

The following facts are taken from plaintiffs' Marco J. Muscarello, individually and

Marco J. Muscarello, derivatively on behalf of Eldercare Risk Management, Inc. ("ECRM"),

adversary complaint and from all public records and proceedings to which the parties refer.

Many of the facts alleged in the complaint, which were admitted in the answer, are uncontested.

Debtors Richard Blackburn and Victoria Blackburn ("Debtors") filed a voluntary Chapter

13 bankruptcy petition on April 3, 2007.  The meeting of creditors, pursuant to 11 U.S.C. § 341,

was held on May 2, 2007 and objections to discharge were due by July 2, 2007, which was

subsequently extended to August 17, 2007 by the Court's order.  Plaintiffs served subpoenas to

third-parties, accountants Charles J. Motl & Associates and attorney Thomas Young, as well as

LegalZoom.com, Inc. for examination and documents, pursuant to Bankruptcy Rule 2004, and,

in orders dated May 24, 2007, the Court granted Plaintiff's request for Rule 2004 discovery.

On August 14, 2007, Plaintiffs filed adversary complaint number 07-A-00796 to object to

Debtors' discharge under five counts, pursuant to 11 U.S.C. §§ 523(a)(4), (a)(6).  In Count I,

Muscarello, acting derivatively on behalf of ECRM, sought recovery of a non-dischargeable

judgment against Debtors, pursuant to section 523(a)(6), for willful and malicious injury to

property.  In Count II, Muscarello, acting derivatively on behalf of ECRM, sought recovery of a

non-dischargeable judgment against Debtors, pursuant to section 523(a)(4), for fraud or

defalcation while acting in a fiduciary capacity.  In Count III, Muscarello, acting derivatively on

behalf of ECRM, sought recovery of a non-dischargeable judgment against Debtors, pursuant to section 523(a)(4) for larceny.  In Count IV, Muscarello, acting individually, sought recovery of a nondischargeable judgment against Debtors, pursuant to section 523(a)(6), for willful and malicious injury to property.  In Count V, Muscarello, acting individually, sought recovery of a nondischargeable judgment against Debtors, pursuant to section 523(a)(4), for fraud and defalcation while acting in a fiduciary capacity.  Debtors filed an answer on October 5, 2007.

Debtors' modified Chapter 13 plan, filed September 6, 2007, was confirmed on September 10, 2007 and provided 100% payments to unsecured creditors over sixty (60) months.  The order dated September 10, 2007 that confirmed Debtors' plan was vacated on September 20, 2007.

Regarding Plaintiffs' § 523 adversary complaint, the Court conducted a trial on March 10, 11, 12 and 16, 2009.  On May 11, 2009, Debtors' attorneys, Myler, Ruddy & McTavish, and Debtors' valuation expert, James D. Keith, sought compensation for post-petition services in their representation of Debtors in their adversary trial as well as for priority cost of administrative claim, pursuant to 11 U.S.C. §§ 330, 503, 507.  Debtors subsequently filed a motion to voluntary convert to Chapter 7 on May 13, 2009.

A little background is in order.  In 1994, Debtor Richard Blackburn ("Blackburn") was a senior health care consultant at CNA insurance for approximately four years providing risk management consulting to long-term care nursing home accounts, (Blackburn Test., Tr. 3/10/09, 102-03), but CNA terminated his employment in November 1998 as part of an internal downsizing of Blackburn's department.  (Stipulation of Facts ("Stip") No. 3)  Blackburn then created Eldercare Risk Management, Inc. ("ECRM"), which was originally organized as an Illinois corporation in November 1998.  (Stip No. 1)  Initially, the corporation was called Windy Park Associates, Inc., (Stip No. 1), and Blackburn was the sole shareholder, director, and officer

of Windy Park Associates, Inc. when he was issued 1,000 shares of common stock. (Stip No. 2)
The services performed by ECRM were similar to the consulting services which Blackburn
performed while at CNA. (Blackburn Test., Tr. 3/10/09, 102-103)

Plaintiff Mark Muscarello ("Muscarello") is both an attorney licensed to practice law and
a licensed certified public accountant ("CPA") in the State of Illinois, but he retired from the
active practice of law in 2001. (Stip No. 4) Blackburn's former domestic relations' attorney,
Thomas Young, referred him to his law partner, Muscarello, who was the partner within the law
firm that handled business matters. (Young Test., Tr. 3/11/09, 83-84) Muscarello was the
attorney that prepared the organizational documents for Windy Park Associates, Inc. (Stip No.
5).

Shortly after the organization of Windy Park Associates, Inc., Blackburn and Muscarello
reached an agreement which provided, among other things, that Muscarello would pay $2,000
for one-third of the issued and outstanding common shares of Windy Park Associates, Inc. (Stip
No. 6) On January 29, 1999, Windy Park Associates, Inc., filed Articles of Amendment to
change the corporation name to Eldercare Risk Management, Inc. and increase the number of
issued and authorized shares to 3,000. (Stip No. 7) On January 13, 1999, Richard Blackburn, as
sole shareholder and director of Windy Park Associates, Inc., caused the by laws of the
corporation to be amended to increase the number of directors to two persons, Muscarello and
Blackburn. (Stip No. 8) No other person has served as an ECRM director at any time since
January 13, 1999. (Stip No. 9) In a memorandum labeled "Directors Action" and dated
December 27, 1999, Muscarello and Blackburn agreed to set Blackburn's annual salary at
$50,000 beginning in 2000 and Muscarello's salary at $25,000 per year beginning when ECRM
generated sufficient income to pay Muscarello's salary. (Pl.'s Ex. 1)

In November 2000, Blackburn asked Muscarello for additional funding for ECRM to

meet its working capital needs. (Blackburn Test., Tr. 3/12/09, 68-69) Muscarello sought 50%

ownership of the company in return for advancing $10,000 to ECRM from his wife's account.

(Muscarello Test., Tr. 3/10/09, 32-33; Pl.'s Ex. 2; Blackburn Test., Tr. 3/12/09, 68-69, 98) In

November 2000, Muscarello's wife, Patricia Muscarello, issued a check drawn upon her Merrill

Lynch brokerage account payable to ECRM in the amount of $10,000, (Stip No. 15), and,

although Blackburn claimed he was shocked by Muscarello's request for an increase

in his percentage ownership of ECRM, he accepted the check; did not voice any objection to

Muscarello becoming a 50% owner; and signed tax returns from 2001 through

2007 that showed Muscarello as the owner of 50% of the shares of ECRM. (Blackburn Test., Tr.

3/12/09, 46-47; Pl.'s Exs. 5-10) Muscarello prepared ECRM's tax returns from 2000 through

2003, (Stip No. 13), while Charles Motl prepared the tax returns for ECRM for 2004, 2005, and

2006. (Stip No. 14) From the commencement of the engagement of his accounting firm, Motl

understood that Muscarello was the owner of 50% of the shares of ECRM. (Motl Test., Tr.

3/10/09, 192) Moreover, Blackburn signed ECRM's 2004 through 2006 tax returns that

indicated that both he and Muscarello owned 50% of the shares. (Plaintiff's Exs. 7-9)

Between 2001 and 2002, Muscarello and Blackburn had discussions about Muscarello

further assisting ECRM in obtaining a line of credit from Amcore Bank for $25,000 which was

eventually guaranteed by Muscarello. (Blackburn Test., Tr. 3/12/09, 79) According to

Muscarello, in exchange for providing additional funding for ECRM to obtain financing,

Muscarello and Blackburn, on behalf of ECRM, allegedly agreed to the "Ten Percent

Agreement" which had the following elements:

- A. Muscarello would sign the guaranty of the line of credit loan from Amcore
  Bank to ECRM;

- B. Muscarello would relinquish whatever right he had to control the fiscal
  matters of ECRM and cede total control of fiscal decision making to
  Blackburn;

C. Muscarello would have no part in day to day management of the company or hiring and firing decisions; and

D. Muscarello would be entitled to receive as compensation and other benefits in the amount equal to 10% of the gross receipts of ECRM, adjusted to give credit for any salaries paid for insurance or other benefits paid to Muscarello or his wife; the amount due would be calculated each year and any unpaid balance would be reflected as a shareholder loan on books and records of the company. Specifically, it would be shown on schedule L of the 1120 S tax return.

(Muscarello Test., Tr. 3/10/09, 41-44; Blackburn Test., Tr. 3/12/09, 79; Pl.'s Ex. 3, first para., 2).

Blackburn testified that, on behalf of ECRM, he agreed to some form of this proposal,

particularly that Muscarello would be entitled to 10% of ECRM's annual gross receipts.

(Blackburn Test., Tr. 3/12/09, 79). The parties dispute whether the "Ten Percent Agreement"

was memorialized in a written agreement or if the documents were misplaced, (Muscarello Test.,

Tr. 3/10/09, 44-46; Blackburn Test., Tr. 3/12/09, 92), but a written version of the "Ten Percent

Agreement" was never submitted to the Court. During the entire course of the relationship of

ECRM, Muscarello and Blackburn, Muscarello's maximum cash investment into ECRM did not

exceed $18,000. (Muscarello Test., Tr. 3/10/09, 94).

Beginning in 2002 and continuing through 2006, ECRM's gross revenues were:

2002 - $731,706.00
2003 - $850,881.00
2004 - $655,694.00
2005 - $549,954.00
2006 - $476,218.00

(Blackburn's Ex. 2, 6; Pl.'s Exs. 5-9) In 2007, Beacon Risk Management, a subsequent, yet

similar company created by Debtors, had gross revenues of $256,569.00. (Blackburn's Ex. 3, 7;

Pl.'s Ex. 10) For tax years 2002 through 2006, schedule L of ECRM's 1120 S tax returns

indicated loans from shareholders as:

| Year | - | Beginning Total | - | End Total | - | Difference |
|------|---|-----------------|---|-----------|---|------------|
| 2002 | - | $30,035.00 | - | $60,531.00 | - | $30,496.00[1] |
| 2003 | - | $60,531.00 | - | $132,266.44 | - | $71,735.44[2] |
| 2004 | - | $0.00 | - | $19,162.00[3] | - | $19,162.00[4] |
| 2005 | - | $19,162.00 | - | $19,111.00[5] | - | $51.00[6] |
| 2006 | - | $19,111.00 | - | $16,846.007 | - | ($2246.00)[8] |

(Pl.'s Exs. 5-9)  Subtracting the adjustments paid to (1) Muscarello's wife for salary in 2002 and

2003; (2) Muscarello and his wife for health insurance premiums in 2002 and 2003; and (3)

Muscarello for cell phone service in 2003, under the "Ten Percent Agreement" and according to

Muscarello, Muscarello is entitled to $300,451.44 from ECRM.

| Item | - | Amount Due |
|------|---|------------|
| Unpaid Shareholder loans as of 12/31/2003, per tax return | - | $132,266.44 |
| 10% of 2004 Gross Revenues | - | $65,569.40 |
| 10% of 2005 Gross Revenues | - | $54,995.40 |
| 10% of 2006 Gross Revenues | - | $47,621.80 |
| Total: | - | $300,453.04 |

The relationship between Muscarello and Blackburn began to deteriorate in 2003.  In July

2003, Muscarello decided to not guarantee a $150,000 line of credit for ECRM with Amcore

Bank that was to be secured by ECRM's accounts receivable. (Muscarello Test., Tr. 3/10/09, 53-

---

1 This includes: (1) monies owed to Muscarello under the "Ten Percent Agreement" Agreement at $73,171.00 or 10% of 2002 gross revenue for ECRM, which equaled $731,706.00, subtracted by (2) monies paid to Muscarello's wife, Trish, for salary at ($21,922.96) and (3) health insurance premiums paid for the Muscarello's at ($20,752.00), which ultimately totaled $30,496.04 owed to Muscarello in 2002. (Pl.'s Ex. 13)

2 This includes: (1) monies owed to Muscarello under the "Ten Percent Agreement" at $85,088.10 or 10% of 2003 gross revenues for ECRM, which equaled $850,881.00, subtracted by (2) monies paid to Muscarello's wife, Trish, for salary at ($8,076.88), (3) health insurance premiums paid for the Muscarello's at ($12,786.00), and (4) Muscarello's AT&T wireless cell phone service at ($500.64), which ultimately totaled $63,724.58 owed to Muscarello in 2003. (Pl.'s Ex 11)  The Court notes that there is an additional $8010.86 ($71,735.44 - $63,724.58) on the 2003 Schedule L (loans to shareholders) when compared to the amount listed pursuant to the "Ten Percent Agreement" after monies were paid for various Muscarello expenses and salary.

3 The 2004, 2005 and 2006 ECRM tax returns prepared by Motl reflect a shareholder loan on Schedule L, Line 19 – loans from shareholders outstanding end of the year amounts still due shareholder (Blackburn) as $3111 and Muscarello as $16,000. (Pl.'s Exs. 7-9)

4 Motl prepared ECRM's 2004 through 2006 tax returns, but Blackburn did not fully inform Motl of the "Ten Percent Agreement," and, thus, these tax returns may not reflect the entire extent of the shareholder loan relating to the "Ten Percent Agreement." (Motl Test., Tr. 3/10/09, 176-78)

5 See supra, n.3.

6 See supra, n.4.

7 See supra, n.3.

8 See supra, n.4.

55; Muscarello Test., Tr. 3/16/09, 23-24; Pl.'s Exs. 3, 49) This led Blackburn to believe that Muscarello was no longer committed to the success of ECRM. (Pl.'s Exs. 48-49; Blackburn Test., Tr. 3/16/09, 13-14) Thus, Muscarello did not support Blackburn's proposed "Sapphire" project, which required the additional financing. (Muscarello Test., Tr. 3/16/09, 18-20) In addition, there was tension surrounding the office relocation from the shared space with Muscarello at the location of his old law firm, (Muscarello Test., Tr. 3/10/09, 34, 46-48), to another location where Blackburn and his wife Victoria Blackburn ("Victoria") relocated the offices. (Muscarello Test., Tr. 3/10/09, 46) Moreover, Blackburn never informed Muscarello of any of ECRM's financial problems and did not respond to Muscarello's letter dated May 10, 2006 about the state of the business of ECRM or the 2004 and 2005 income tax returns that Blackburn sent to Muscarello in early 2006. (Muscarello Test., Tr. 3/10/09, 67-71, 78-79; Pl.'s Ex. 15)

From the time of its organization until May 2005, Muscarello was the registered agent of ECRM, but, on May 6, 2005, without notifying Muscarello, Blackburn changed ECRM's registered agent to himself. (Stip No. 12; Muscarello Test., Tr. 3/10/09, 66-67) Furthermore, Blackburn did not ask Muscarello for advise, assistance or money to assist ECRM even though he knew Muscarello was an experienced business person, a lawyer experienced in business affairs, and a certified public accountant. Instead, Blackburn unilaterally decided to close ECRM in November 2006. (Blackburn Test., Tr. 3/10/09, 165, 169-70). Blackburn, without Muscarello's signature or consent, filed ECRM's Articles of Dissolution with the Illinois Secretary of State on January 18, 2007. (Pl.'s Ex. 46)

On December 11, 2006, Blackburn placed an order with LegalZoom to prepare and file organizational papers for Beacon Risk Management Services, Inc., ("Beacon"). (Stip No. 16) On December 11 and 12, 2006, Blackburn placed telephone calls and emailed the three principal

ECRM customers for the purpose of informing them that he was forming a new business, dissolving ECRM, and transferring all ECRM business to Beacon. (Blackburn Test., Tr. 3/10/09,141-53; Pl.'s Exs. 27-28) Blackburn intended that ECRM's former customers would not recognize any difference between ECRM and Beacon. (Blackburn Test., Tr. 3/10/09, 145-146) Blackburn and his wife Victoria were the sole shareholders, directors, and officers of Beacon from its inception. (Pl.'s Ex. 21; Stip No. 19) Beacon's Articles of Incorporation were filed with the Illinois Secretary of State on December 27, 2006. (Stip No. 17) Beacon began active business operations on January 2, 2007 from offices in the basement of the Blackburn's residence at 3119 Chatham Lane, Dundee, IL 60118. (Stip No. 18) Beacon performed the same services to the same ECRM customers and had the same business model. (Blackburn Test., Tr. 3/10/09, 216-217; Pl.'s Exs. 27-28) Even ECRM's old website directed former ECRM customers to Beacon until May 2007. (Muscarello Test., Tr. 3/10/09, 83-87; Pl.'s Exs. 34-36) Blackburn took four ECRM computers and moved them to his residence for use by Beacon. (Blackburn Test., Tr. 3/10/09, 154)

Blackburn and his wife, Victoria, held the ECRM board of directors meeting at their residence without the only other director Muscarello on December 14, 2006 and unilaterally made the decision to close ECRM, which was formalized in meeting minutes. (Pl.'s Ex. 22) Prior to the December 14, 2006 meeting, no written notice of a meeting of directors was given to Muscarello. (Blackburn Test., Tr. 3/10/09, 208-09; Muscarello Test., Tr. 3/10/09, 79) Despite the assertions in the ECRM meeting minutes dated December 14, 2006, the decision to dissolve ECRM, discontinue its business, and form a successor company called Beacon had been made prior to December 14, 2006. There were conversations and emails between Blackburn and ECRM's three main customers on December 11, and 12, 2006. Blackburn engaged LegalZoom to incorporate Beacon on December 11, 2006 and prepared Beacon's Articles of Incorporation

on December 12, 2006. Blackburn made no effort to contact Muscarello by telephone or otherwise when Muscarello was not in attendance December 14, 2006. (Blackburn Test., Tr. 3/10/09, 218-219) By instituting a board meeting on December 14, 2006, Blackburn understood and elected to not communicate to Muscarello that ECRM was dissolving; that Beacon was going to begin as a new entity with virtually the same business as ECRM on January 1, 2007; and that the arrangements for the dissolution of ECRM and the commencement of Beacon had been implemented as of December 12, 2006. (Blackburn Test., Tr. 3/10/09, 218-19)

Blackburn first notified Muscarello of the dissolution of ECRM and the winding up of its business on December 29, 2006, when he prepared a letter to Muscarello at his home in Arizona which included a draft ECRM's Articles of Dissolution. (Pl.'s Ex. 24) This letter made no reference to the December 14, 2006 meeting, related meeting minutes or the formation of Beacon. (Pl.'s Ex. 24)

Blackburn and his wife, Victoria, jointly prepared the final Articles of Dissolution, form BCA12.20, dated December 29, 2006, and filed it with the Illinois Secretary of State on January 18, 2007. (Pl.'s Ex. 46) The Articles of Dissolution contained numerous errors and falsehoods, including: (1) At Section 3 of the Article of Dissolution, Blackburn and Victoria certified under penalty of perjury that the shareholders had either authorized the dissolution either by informal action or a formal meeting at which at least two-thirds of the shareholders affirmatively voted in favor dissolution in accordance with the provisions of Section 7.10 or 12.15 of the Illinois Business Corporation Act; and (2) in Section 3, the shareholders had executed written consent to the dissolution and that any shareholder, who did not consent, had been given written notice of the meeting at which action was taken in accordance with Section 7.10. (Pl.'s Ex. 46)

Beacon's December 2007 monthly statement, prepared by Motl, indicates that Blackburn received a salary from Beacon of $50,769.24 and that Victoria received a salary from Beacon of

$25,384.56. (Pl.'s Ex. 42, Dec. 31, 2007 financial statement, 5)  This was in addition to the shareholders distribution of $42,045.29 which equates to a total of $118,199.09 as compensation or ownership distributions from Beacon in 2007.  (Pl.'s Ex. 42, Dec. 31, 2007 financial statement, 5)

## Valuation of ECRM

Muscarello called Jeffery Krol ("Krol") to give expert testimony concerning the value of ECRM.  (Krol Rpt., Pl.'s Ex. 45)  Krol has been a CPA since 1976, has been an accounting firm owner since 1980, and has performed several hundred valuation assignments of small, closely held businesses over the past 25 years.  (Krol Test., Tr. 3/11/09, 24; Krol Rpt., Ex. 45)  Using the normalized income approach, pursuant to Internal Revenue Service ("IRS") Revenue Ruling 5960, Krol testified that the value of Muscarello's 50% ownership interest in ECRM at the end of 2006 was $166,727.  (Pl.'s Ex. 45)  Revenue Ruling 5960 requires the valuator to (1) determine what a hypothetical buyer and seller would agree to as a sales price to determine market value for a company, (Krol Test., Tr. 3/11/09, 39-40); and (2) make certain "normalizing" adjustsments to the reported income statements.  (Krol Test., Tr. 3/11/09, 30-33).  Krol further testified that ECRM's principal asset was its goodwill generated by the business as reflected in current or expected future income.  (Krol Test., Tr. 3/11/09, 41-42)  Krol determined his valuation based on the results of ECRM's business operations in 2005 and 2006 as well as the results of Beacon's business operations in 2007.  (Krol Test., Tr. 3/11/09, 29-33)  Krol, however, did not offer any opinion regarding Beacon's value.  Krol testified that ECRM's closing was not inevitable due to its tax liabilities because ECRM could have entered into an installment agreement with the taxing authorities, rather than use wages earned from Beacon, to pay ECRM tax debt through their Chapter 13 plan.  (Krol Rpt., Pl.'s Ex. 45, 3)

In opposition, Blackburn called James Keith ("Keith") to give expert testimony

concerning the value of ECRM. (Keith Rpt., Blackburn's Ex. 2)  Keith has performed valuations

and handled troubled financial companies for at least twenty years, but he is neither a certified

business valuator, nor a certified public accountant, nor does he have any formal training in

accountancy or evaluation. (Keith Test., Tr. 3/12/09, 89-92, 108, 119)  Keith testified that the

value of Muscarello's 50% of ownership interest in ECRM at the end of 2006 was $0. (Keith

Test., Tr. 3/12/09)  Keith further testified that the value of 100% interest in Beacon was $23,100

at the end of 2007 and $14,900 at the end of June 2008. (Keith Test., Tr. 3/12/09)  Thus, if

Beacon's value is attached to ECRM's value, then the value of Muscarello's 50% ownership

interest in Beacon at the end of 2007 was $11,550 and $7450 in June 2008.  For his valuation,

Keith utilized gross revenues for the year preceding the closing of ECRM without analyzing

profit. (Keith Rpt., Blackburn's Ex. 2, 6-7; Keith Test., Tr. 3/12/09, 125-26)  Keith testified that

his ECRM valuation was based on the consistent decline in gross revenue from 2002 to 2006 and

that ECRM experienced an operating loss of $25,000 in 2006. (Keith Rpt., Blackburn's Ex. 2, 6;

Keith Test., Tr. 3/12/09, 126-29)  Keith did not make any adjustments for income deferred from

ECRM's orders in late 2006 that were deferred to 2007 when ECRM's business was transferred

to Beacon. (Keith Test., Tr. 3/12/09, 126-27)

## DISCUSSION

The main purpose of a discharge in bankruptcy is to give a debtor a fresh start. See Vill.

of San Jose v. McWilliams, 284 F.3d 785, 790 (7th Cir. 2002).  The party that seeks to establish

an exception to the discharge of a debt bears the burden of proof. Goldberg Secs., Inc. v.

Scarlata (In re Scarlata), 979 F.2d 521, 524 (7th Cir. 1992); Banner Oil Co. v. Bryson (In re

Bryson), 187 B.R. 939, 957 (Bankr. N.D. Ill. 1995).  The United States Supreme Court has held

that the burden of proof required to establish an exception to discharge is a preponderance of the

evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991); see also In re McFarland, 84 F.3d 943,

946 (7th Cir. 1996); In re Thirtyacre, 36 F.3d 697, 700 (7th Cir. 1994). Exceptions to discharge

are to be construed strictly against a creditor and liberally in favor of a debtor. In re Morris, 223

F.3d 548, 552 (7th Cir. 2000); Kolodziej v. Reines (In re Reines), 142 F.3d 970, 972-73 (7th Cir.

1998); In re Zarzynski, 771 F.2d 304, 306 (7th Cir. 1985). "The statute is narrowly construed so

as not to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start."

Park Nat'l Bank & Trust of Chi. v. Paul (In re Paul), 266 B.R. 686, 693 (Bankr. N.D. Ill. 2001).

Section 523 of the Bankruptcy Code enumerates specific, limited exceptions to the

dischargeability of debts.

### A.  11 U.S.C. § 523(a)(4)

Section 523(a)(4) provides as follows:

> (a) A discharge under section 727 . . . does not discharge an
> individual debtor from any debt--
> . . . .
> (4) for fraud or defalcation while acting in a fiduciary capacity,
> embezzlement, or larceny[.]

11 U.S.C. § 523(a)(4). The meaning of these terms is a question of federal law.

In re Burke, 398 B.R. 608, 625 (Bankr. N.D. Ill. 2008) (citing In re McGee, 353 F.3d 537, 540

(7th Cir. 2003)).

Most courts apply the general rule that the creditor bears the burden of proof in a

proceeding to determine the dischargeability of a debt under section 523(a)(4). Fowler Bros. v.

Young (In re Young), 91 F.3d 177 (10th Cir. 1996); Coburn Co. v. Nicholas (In re Nicholas),

956 F.2d 110 (5th Cir. 1992); 4 COLLIER, ¶ 523.10[1][c].

"Fraud" for purpose of this exception has generally been interpreted as involving

intentional deceit, rather than implied or constructive fraud. In re Tripp, 189 B.R. 29 (Bankr.

N.D.N.Y. 1995); In re McDaniel, 181 B.R. 883 (Bankr. S.D. Tex. 1994); 4 COLLIER ON

BANKRUPTCY ¶ 523.10[1][a] (15th ed. 2008).

"Defalcation" is not defined in the Bankruptcy Code, but the term "defalcation" has been used in the Bankruptcy Code since 1841. Meyer v. Rigdon, 36 F.3d 1375, 1382-83 (7th Cir. 1994) (citing Central Hanover Bank & Trust Co. v. Herbst, 93 F.2d 510, 511 (2d Cir.1937) (the leading case defining "defalcation")). Judge Learned Hand in Herbst concluded that while a purely innocent mistake by the fiduciary may be dischargeable, a "defalcation" for purposes of this statute does not have to rise to the level of "fraud," "embezzlement," or even "misappropriation." Meyer, 36 F.3d at 1384 (citing Herbst, 93 F.2d at 512). The Seventh Circuit held that defalcation requires reckless conduct. Id. at 1385; In re Howard, 339 B.R. 913, 920-21 (Bankr. N.D. Ill. 2006); 4 COLLIER, ¶ 523.10[1][b].

The Seventh Circuit has found that a fiduciary relationship exists for purposes of section 523(a)(4) when there is "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter." Burke, 398 B.R. at 625 (quoting In re Marchiando, 13 F.3d 1111, 1116 (7th Cir. 1994)); see also In re Woldman, 92 F.3d 546, 547 (7th Cir. 1996) ("[S]ection 523(a)(4) reaches only those fiduciary obligations in which there is substantial inequality in power or knowledge."). Thus, a lawyer-client relationship, a director-shareholder relationship, and a managing partner-limited partner relationship all require the principal to "repose a special confidence in the fiduciary." Burke, 398 B.R. at 625 (quoting O'Shea v. Frain (In re Frain), 230 F.3d 1014, 1017 (7th Cir. 2000)). Not all fiduciary relationships, however, fall within the purview of § 523(a)(4). Ibid. (citing Woldman, 92 F.3d at 547). A fiduciary relation qualifies under § 523(a)(4) only if it "imposes real duties in advance of the breach. . . ." Ibid. (quoting Marchiando, 13 F.3d at 1116 (lottery agent not a "fiduciary")). Therefore, the fiduciary's obligation must exist prior to the alleged wrongdoing. Ibid. (citing Marchiando, 13 F.3d at 1116).

In larceny, felonious intent must exist at the time of the taking. BLACK'S LAW

DICTIONARY (6th ed. 1990); see United States LifeTitle Ins. Co. v. Dohm, 19 B.R. 134 (N.D. Ill.

1982); see also 4 COLLIER, ¶ 523.10[2]. Thus, in larceny, the original taking must be unlawful.

In re Brown, 399 B.R. 44, 47 (Bankr. N.D. Ind. 2008) (citing In re Rose, 934 F.2d 901, 903 (7th

Cir. 1991) (discussing larceny); In re Hofmann, 144 B.R. 459, 464 (Bankr. D. N.D. 1992)).

Larceny is proven for § 523(a)(4) purposes if the debtor has wrongfully and with fraudulent

intent taken property from its owner. In re Rose, 934 F.2d at 903; see also Amcore Bank N.A. v.

House, No. 07 C 4934, 2007 WL 2908815, at *1 (N.D. Ill. Oct. 4, 2007).

Here, the Court finds that there is not "a difference in knowledge or power between

fiduciary and principal which . . . gives the former a position of ascendancy over the latter."

Burke, 398 B.R. at 625. Not all fiduciary relationships fall within the purview of § 523(a)(4).

Ibid. Unlike a managing partner-limited partner relationship, Blackburn and Muscarello were

equal or 50% partners. Moreover, Muscarello was not a principal who "repose[d] a special

confidence in the fiduciary." Ibid. Instead, Muscarello, a CPA, was the partner in the law firm

who handled business matters, (Young Test., Tr. 3/11/09, 83-84), and then prepared the

organizational documents for ECRM. (Stip No. 5). Thus, Muscarello fails to meet his burden

for fraud or defalcation while acting in a fiduciary capacity under section 523(a)(4).

The Court finds that Plaintiffs have not met their burden as to larceny under § 523(a)(4).

The original taking must be unlawful. In re Brown, 399 B.R. at 47; In re Rose, 934 F.2d at 903.

Plaintiffs argue that Blackburn misappropriated computers and committed larceny by his

"unauthorized diversion" of $18,910.10 in orders placed with ECRM that were collected by

Beacon in January 2007. Blackburn had a reasonable basis to conclude that this business would

not be completed and paid until ECRM closed and Beacon had launched in its place. Thus, there

was not the fraudulent intent necessary at the time of the original taking to constitute larceny

under § 523(a)(4).

### B.  11 U.S.C. § 523(a)(6)

Section 523(a)(6) provides as follows:

> (a) A discharge under section 727 . . . does not discharge an
> individual debtor from any debt–
> . . . .
> (6) for willful and malicious injury by the debtor to another entity or to
> the property of another entity[.]

11 U.S.C. § 523(a)(6).

To determine the non-dischargeability of a debt under section 523(a)(6), a creditor must prove three elements by a preponderance of the evidence: (1) the debtor intended to and caused an injury to the creditor's property interest; (2) the debtor's actions were willful; and (3) the debtor's actions were malicious.  Burke, 398 B.R. at 625 (citing Baker Dev. Corp.v. Mulder (In re Mulder), 307 B.R. 637, 641 (Bankr. N.D. Ill. 2004); Glucona Am., Inc. v. Ardisson (In re Ardisson), 272 B.R. 346, 356 (Bankr. N.D. Ill. 2001)).  The requirements of "willfulness" and "maliciousness" are distinct requirements in the statutory text and are usually treated as such by the courts.  4 COLLIER, ¶ 523.12[2]; see Carrillo v. Su (In re Su), 290 F.3d 1140 (9th Cir. 2002).

"The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."  Burke, 398 B.R. at 625 (quoting Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998)).  Under Geiger and its stringent standards, to satisfy the requirements of § 523(a)(6), a creditor must plead and prove that the debtor actually intended to harm him and not merely that the debtor acted intentionally and he was thus harmed.  Burke, 398 B.R. at 625-26 (citing Geiger, 523 U.S. at 61-62).  Thus, the debtor must have intended the tortious consequences of his act.  Burke, 398 B.R. at 626 (citing Geiger, 523 U.S. at 61-62; Berkson v. Gulevsky (In re Gulevsky), 362 F.3d 961, 964 (7th Cir. 2004)).  Injuries either negligently or recklessly inflicted do not come within the scope of § 523(a)(6).  Ibid. (citing Geiger, 523 U.S. at

64).

The Supreme Court did not define the scope of the term "intent" utilized to describe willful conduct. Recent decisions, however, have found that either a showing of subjective intent to injure the creditor or a showing of a debtor's subjective knowledge that injury is substantially certain to result from his acts can establish the requisite intent required by Geiger. Burke, 398 B.R. at 626 (citing Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 463-65 (6th Cir. 1999); Tex. By & Through Board of Regents of Univ. of Tex. Sys. v. Walker, 142 F.3d 813, 823 (5th Cir.1998); Su v. Carrillo (In re Su), 259 B.R. 909, 913 (B.A.P. 9th Cir. 2001), aff'd, 290 F.3d 1140 (9th Cir. 2002); Fidelity Fin. Servs. v. Cox (In re Cox), 243 B.R. 713, 719 (Bankr. N.D. Ill. 2000)). But see Miller v. J.D. Adams, Inc. (In re Miller), 156 F.3d 598 (5th Cir. 1998) (employing an objective standard under which the "willfulness" requirement is satisfied if there is either a subjective intent to cause injury or an objective certainty that the conduct will cause injury). Because a person will rarely admit to acting in a willful and malicious manner, those requirements must be inferred from the circumstances surrounding the injury. Burke, 398 B.R. at 626 (citing Cutler v. Lazzara (In re Lazzara), 287 B.R. 714, 723 (Bankr. N.D. Ill. 2002)).

An act is "malicious" if it is taken "in conscious disregard of one's duties or without just cause or excuse. . . ." Burke, 398 B.R. at 626 (quoting Thirtyacre, 36 F.3d at 700). The test for maliciousness under § 523(a)(6) is (1) a wrongful act, (2) done intentionally, (3) which causes injury to the creditor, and (4) is done without just cause and excuse. Ibid. (citing Paul, 266 B.R. at 696); see also Thirtyacre, 36 F.3d at 700. A debtor does not have to act with ill will or a specific intent to do harm to the creditor for the conduct to be malicious. Burke, 398 B.R. at 626 (citing Thirtyacre, 36 F.3d at 700). Whether an actor behaved willfully and maliciously is ultimately a question of fact reserved for the trier of fact. Ibid.

"Injury" means the violation of another's legal right or the infliction of an actionable

wrong. Bukowski v. Patel, 266 B.R. 838, 844 (E.D. Wis. 2001) (citing BLACK'S LAW

DICTIONARY 785-86 (6th ed.1990)).  Injuries covered under section 523(a)(6) are not confined to

physical damage or destruction; an injury to intangible personal or property rights is sufficient.

See ibid. (citing In re Riso, 978 F.2d 1151 (9th Cir. 1992) (contract rights); In re Rushing, 161

B.R. 984 (Bankr. E.D. Ark. 1993) (real property)); see also 4 COLLIER, ¶ 523.12[4].  The

conversion of another's property without the owner's knowledge or consent, done intentionally

and without justification and excuse, is a willful and malicious injury within the meaning of the

exception.  In re Meyer, 7 B.R. 932, 932 (Bankr. N.D. Ill. 1981); see In re Moore, Nos. 98-

70726, 98-7090, 1999 WL 33593323, at *2 (Bankr. C.D. Ill. Jan. 14, 1999); In re Lampi, 152

B.R. 543 (C.D. Ill. 1993); Sec. Bank of Nev. v. Singleton, 37 B.R. 787 (Bankr. D. Nev. 1984);

see also S.Rep.No. 989, 95th Cong., 2d Sess. 77 (1978), reprinted in 1978 U.S.Code Cong. &

Ad. News 5787.; 4 COLLIER, ¶ 523.12[4].

       Here, Muscarello, derivatively and individually, has met his burden to satisfy his

maliciousness claims under section 523(a)(6).  The test for maliciousness under section 523(a)(6)

is (1) a wrongful act, (2) done intentionally, (3) which causes injury to the creditor, and (4) is

done without just cause and excuse.  Burke, 398 B.R. at 626; Thirtyacre, 36 F.3d at 700.  The

decision to dissolve ECRM, form Beacon and transfer ECRM's business to Beacon was

conceived and implemented by December 12, 2006 when Debtors informed ECRM's main

customers that Beacon would replace ECRM as their service provider.  In addition, Debtors had

retained LegalZoom to form the new company and dissolve ECRM in December 2006.  Then, in

a board of directors meeting held on December 14, 2006, Debtors attempted to authorize the

dissolution of ECRM, but Blackburn failed to inform the only other director, Muscarello, of the

meeting.

       Debtors understood and elected to not communicate to Muscarello that ECRM was

dissolving; that Beacon was going to begin as a new entity with virtually the same business as ECRM on January 1, 2007; and that the arrangements for the dissolution of ECRM and the commencement of Beacon had been implemented as of December 12, 2006. Debtors also submitted a materially false Articles of Dissolution to the Illinois Secretary of State that indicated that the shareholders had approved the dissolutions, despite the fact that the majority of shareholders had not approved this action. Furthermore, Debtors intentionally diverted the majority of their ECRM business to Beacon since Beacon was not conditioned under the "Ten Percent Agreement." Blackburn testified that, on behalf of ECRM, he agreed to some form of the "Ten Percent Agreement" proposal, particularly the 10% annual gross receipts of ECRM to Muscarello. The only remaining question is the extent of injury to Muscarello.

The first question involves the value of the "Ten Percent Agreement." In exchange for providing additional funding for ECRM to obtain a line of credit from Amcore Bank for $25,000, Muscarello and Blackburn, on behalf of ECRM, agreed to the "Ten Percent Agreement" which provided that Muscarello would be entitled to receive as compensation an amount equal to 10% of the gross receipts of ECRM, adjusted to give credit for any salaries, medical insurance or other miscellaneous benefits. Subtracting the adjustments paid to (1) Muscarello's wife for salary in 2002 and 2003; (2) Muscarello and his wife for health insurance premiums in 2002 and 2003; and (3) Muscarello for cell phone service in 2003, under the 10% Agreement, Muscarello is entitled to $300,453.04 from ECRM.

The second question on the value of injury involves the valuation of ECRM when it closed. Two competing experts, Krol for Muscarello and Keith for Debtors, gave testimony regarding the value of ECRM. Using the normalized income approach, pursuant to IRS Revenue Ruling 5960, Krol testified that the value of Muscarello's 50% ownership interest in ECRM at the end of 2006 was $166,727. (Pl.'s Ex. 45) In contrast, Keith found that the value of

Muscarello's 50% of ownership interest in ECRM as of the end of 2006 was $0 because ECRM has no value. (Keith Rpt., Blackburn's Ex. 2)  ECRM experienced a consistent decline in gross revenue from 2003 ($850,881.00) to 2006 ($476,218.00).

There are a number of factors that distinguish Krol's ECRM valuation from Keith's ECRM valuation.  Krol has more experience with service companies, such as ECRM, and more extensive formal training, than Keith.  Keith made no adjustments for ECRM's deferral of income to Beacon.  Keith mainly focused on gross revenues, but he did not conduct a thorough profit analysis.  Most significantly, while Keith found that ECRM had no value at the end of 2006, he did find that the successor company, Beacon, which has an identical business and customer base to ECRM, did have value in 2007.  In light of these factors, the Court does not agree with Keith that ECRM had no value at the end of 2006.

The Court must next review Krol's normalization approach.  To determine ECRM's valuation, Krol made several adjustments or normalizations to ECRM's 2005 and 2006 income statements, including: outside services; rent; salaries: officers; salaries: general; payroll taxes; and travel and lodging.  In addition, the Court agrees with Krol's testimony that consistently performing insurance consulting agencies typically sell at five (5) to six (6) times earnings, and, a potential buyer would require Blackburn's expertise which necessitates ECRM's multiple of earnings of four (4).  The Court also concurs with Krol's assessment that ECRM should be discounted by 33.33% for its lack of marketability and lack of control.

The Court agrees with Krol's adjustments for "salaries: officers" and its related "Taxes: Payroll," but it does not agree with the remaining adjustments for outside services, rent, travel and lodging, and "Salaries: General."  In the "Directors Action" memorandum dated December 27, 1999, both parties agreed to set Blackburn's annual salary at $50,000 beginning in 2000.  Thus, the Court agrees with this adjustment under Salaries: Officers for Blackburn's salary.  In

2005, ECRM made four "outside consultant" payments to Blackburn and his wife Victoria for $129,916. Since it is not clear from the record whether these payments were for services within the duties contracted under the "Directors Action" memorandum, nor is it specified how much Victoria, who is not listed in the "Directors Action" memorandum, contributed, the Court will not adjust these figures. The Court also does not agree that rent should be valued at $0 or that ECRM's office must be administered from Blackburn's residence. Regarding Krol's adjustment for "Salaries: General," the Court does not agree with Krol's adjustments for Victoria's salary because it is not entirely clear from the record what services Victoria provided, there is no salary agreement similar to the "Directors Action" memorandum, and Victoria's salaries of $30,273 in 2005 and $27,829 in 2006 appear reasonable for an additional assistant, if that was ultimately her role. Travel and lodging was not appropriate deduction because the disputed entries involved a valid business trip to a Hawaiian client. Payroll taxes were adjusted accordingly.[9] Based on these adjustments and utilizing Krol's normalized income approach, the value of Muscarello's 50% ownership interest in ECRM at the end of 2006 was $85,185.

| | | |
|---|---|---|
| Average Normalized Net Income (2005 & 2006) | - | $63,889[10] |
| Multiple of Earnings | - | 4 |
| Fair Market Value of ECRM | - | $255,555 |
| Discount for lack of marketability and lack of control @ 33.3% | - | ($85,185) |

---

[9] Based on Krol's report findings, payroll taxes ($15,984) were 8.19% of salaries ($101,653 - officers; $93,553 - general) in 2005 and 7.85% ($20,561) of salaries ($101,208 - officers; $160,576 - general) in 2006. Similarly, under Krol's normalized findings, payroll taxes ($9535) were 8.42% of salaries ($50,000 - officers; $63,280 - general) in 2005 and 7.85% ($14,339) of salaries ($50,000 - officers; $132,747 - general) in 2006. The average rate of payroll taxes was 8.3% in 2005 and 7.85% in 2006. Under the Court's adjustments, 2005 payroll taxes at 8.3% of salaries ($50,000- officers; $93,553 - general) equals $11,919, while 2006 payroll taxes a 7.85% of salaries ($50,000 - officers; $160,576 - general) equals $16,531.

[10] After adjusting the 2005 entries for salaries: officers from $101,653 to $50,000 and for payroll taxes from $15,984 to $11,919, ECRM's 2005 net income equaled $78,181. Similarly, after adjusting the 2006 entries for salaries: officers from $101,208 to $50,000 and for payroll taxes from $20,561 to $16,531, ECRM's 2006 net income equaled $49,596. Thus, ECRM's net income average for 2005 and 2006 ($49,596; $78,181) equaled $63,889.

Enterprise Value of ECRM
at 12/31/06 net of Discounts         -      $170,370

Fair Market Value of Muscarello's
50% Ownership Interest in ECRM at 12/31/06     -      $85,185

Thus, under the "Ten Percent Agreement," Muscarello is entitled to $300,453.04 from ECRM and Muscarello is entitled to the fair market value of Muscarello's 50% ownership interest in ECRM as of December 31, 2006 which equaled $85,185. Therefore, Muscarello's compensatory damages are $385,638.04.

## C. Request for Punitive Damages

Punitive damages are not intended to compensate the injured party, but rather to punish the defendant and to deter him and others from similar conduct. E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 295 (2002). In a bench trial, the decision to award punitive damages is within the discretion of the trial court. Merritt v. De Los Santos, 721 F.2d 598, 601 (7th Cir. 1983) (citing Busche v. Burkee, 649 F.2d 509 (7th Cir.), cert. denied, 454 U.S. 897, 102 S. Ct. 396, 70 L. Ed. 2d 212 (1981)). Courts apply state law to determine punitive damages under § 523(a), Cohen v. de la Cruz, 523 U.S. 213, 223 (1998), and Illinois law views punitive damages as a punishment. Kochan v. Owens-Corning Fiberglass Corp., 610 N.E.2d 683, 693 (Ill. App. Ct.), appeal denied, 622 N.E.2d 1208 (Ill. 1993); see also In re H. King & Assocs., 295 B.R. 246, 276 (Bankr. N.D. Ill. 2003). Although punitive damages are generally disfavored because of their penal nature, punitive damages may be awarded where the defendant committed a tort with actual malice. In re Misna, Nos. 01-B-03732, 01-A-0422, 2003 WL 21785648, at *9 (Bankr. N.D. Ill. July 31, 2003) (citing Lowe Excavating Co. v. Int'l Union of Operating Eng'rs Local No. 150, 765 N.E.2d 21, 34 (Ill. App. Ct.), appeal denied, 775 N.E.2d 3 (Ill. 2002)). Where pre-petition conduct justifies the award of punitive damages, a bankruptcy court may include those punitive damages in the judgment finding non-dischargeability. Ibid. (citing Diaz v. Diaz (In re Diaz),

120 B.R. 967, 982 (Bankr. N.D. Ind. 1989)). In an appropriate case of breach of fiduciary duty,

punitive damages may be awarded. In re McCook Metals, L.L.C., 319 B.R. 570, 597 (Bankr.

N.D. Ill. 2005) (citing Levy v. Markal Sales Corp., 643 N.E.2d 1206, 1222-23 (Ill. App. Ct.

1994)). For instance, egregious circumstances, such as "underhanded, deceitful and sly"

conduct, may give rise to punitive damages. In re McCook Metals, L.L.C., 319 B.R. at 598

(citing Levy, 643 N.E.2d at 1223).

Muscarello argues that Blackburn's actions as a corporate officer willfully violated his

corporate fiduciary duties and supports an award of punitive damages, citing E.J. McKernan Co.

v. Gregory, 623 N.E.2d 981, 997-98 (Ill. App. Ct. 1993) and Levy, 643 N.E.2d at 379-80. In

Gregory, the jury properly awarded punitive damages when corporate officers concealed

transactions from the McKernan company by directing those opportunities to other corporations

that the officers had formed in competition with the McKernan company. Id. at 990. The

officers had secretly formed new entities in direct competition with the McKernan company and

utilized the same employees and processes to do so. Id. at 987-88. In Levy, the court awarded

punitive damages when directors of a corporation that acted as sales representative for consumer

electronics formed a new entity to act as sales representative for Apple computers, used

corporate assets to benefit their new venture and conspired to actively conceal their actions from

the other shareholders. 643 N.E.2d at 379-80.

The Court finds that Muscarello is not entitled to punitive damages. As noted in part A,

Debtors were not liable as fiduciaries under § 523(a)(4), and, thus, unlike the corporate officers

in Gregory and Levy, Debtors did not breach a fiduciary duty. Moreover, despite Debtors pre-

petition conduct, the Court finds that these actions do not rise to the level of "underhanded,

deceitful and sly" conduct to warrant punitive damages.

**D. Administrative Claim for Attorney's Fees**

Prior to Debtors' conversion from Chapter 13 to Chapter 7, Debtors' attorneys, Myler, Ruddy & McTavish, and Debtors' valuation expert, James D. Keith, sought compensation for post-petition services in their representation of Debtors in their adversary trial and priority cost of administrative claim, pursuant to 11 U.S.C. §§ 330, 503, 507.

Section 329(b) of the Bankruptcy Code effectively allows the Court to determine whether the fees charged by the debtor's attorney are excessive and, if so, the Court may cancel any compensation agreement between the attorney and the client. See In re Mortakis, No. 08 B 14401, 2009 WL 1144005, at *3 (Bankr. N.D. Ill. Apr. 29, 2009) (citing In re Wiredyne, Inc., 3 F.3d 1125, 1127 (7th Cir. 1993)). Section 329(a) requires a debtor's attorney to "file with the court a statement of the compensation paid or agreed to be paid . . . and the source of such compensation." Ibid. (quoting 11 U.S.C. § 329(a)). Bankruptcy courts have wide discretion to determine reasonable compensation for actual and necessary services. In re Wildman, 72 B.R. 700, 705 (Bankr. N.D. Ill. 1987).

Section 330(a)(1) provides:

(a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to . . . a professional person employed under section 327 or 1103--
    (A) reasonable compensation for actual, necessary services rendered by the . . . professional person, or attorney and by any paraprofessional person employed by any such person; and
    (B) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a) (2006). Thus, pursuant to 11 U.S.C. § 330(a)(3), courts should consider six factors to determine whether or not to award attorney fees. Section 330 states, in relevant part:

(a)(3) In determining the amount of reasonable compensation to be awarded to . . . [a] professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
(A) the time spent on such services;
(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3)(A)-(F).  The plain language of § 330(a)(4)(B) allows compensation for services that benefit the debtor.  In re Lee, 209 B.R. 708, 710 (Bankr. N.D. Ill. 1997).  It also allows the court to consider the six factors in § 330(a)(3).

"Once a question has been raised about the reasonableness of the attorney's fee under [§] 329, it is the attorney himself who bears the burden of establishing that the fee is reasonable."  In re Geraci, 138 F.3d 314, 318 (7th Cir. 1998); see also In re Wildman, supra, 72 B.R. 700 at 708. The legislative history for § 329 states that "[p]ayments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy laws, and serious potential for overreaching by the debtor's attorney, and should be subject to careful scrutiny."  In re Mortakis, No. 08 B 14401, slip op. at *6 (Bankr. N.D. Ill. April 29, 2009) (quoting H.R. REP. NO. 95-595, at 329 (1977), as reprinted in 1978 U.S.C.C.A.N. 5787, 6285) (emphasis supplied).

Section 329(a) requires a debtor's attorney to "file with the court a statement of the compensation paid or agreed to be paid . . . and the source of such compensation." 11 U.S.C. § 329(a).  Fee disclosure under § 329 and the Rules is mandatory, not permissive.  In re Mortakis, supra, No. 08 B 14401, slip op. at *6 (citing In re Whaley, 282 B.R. 38, 41 (Bankr. M.D. Fla. 2002)).  Failure to disclose is sanctionable and can include partial or total denial of compensation, as well as partial or total disgorgement of fees already paid.  See In re Prod. Assocs., Ltd., 264 B.R. 180, 186, 189 (Bankr. N.D. Ill. 2001).

Under the Federal Rules of Bankruptcy Procedure 2016, to establish actual and necessary services when an applicant files an application for compensation, an applicant shall submit a detailed statement of the services rendered, time expended and expenses incurred as well as the amounts requested. In re Wildman, supra, 72 B.R. at 707 (citing Fed. R. Bankr. P. 2016). The detailed statement establishes the "actual" requirement, while an accompanying narrative explanation of the "how" and "why" establishes the "necessary" requirement. Ibid.

In addition, Local Bankruptcy Rule 5082-2 and General Order 07-02 identify the requirements for the contents of an application for compensation made by a professional, including a debtor's attorney, under a Chapter 13 case. Bankr. N.D. Ill. R. 5082-2; Bankr. N.D. Ill. Gen. Order 07-02. If a debtor's counsel and debtor enter into a Model Retention Agreement, then counsel may apply for a flat fee not to exceed $3500. Bankr. N.D. Ill. R. 5082-2. If the debtor's counsel and debtor have not entered into a Model Retention Agreement, then counsel must include a completed form itemization with the fee application. Ibid.

Section 503 of the Bankruptcy Code provides for the "allowance" of administrative expenses and derives its importance from section 507. 4 COLLIER, ¶ 503.01. Section 507 provides that certain categories of expenses and claims have priority in the distribution of the assets of the estate. Ibid. Specifically, section 507(a)(2) sets forth second priority for administrative expenses allowed under section 503(b). Ibid. Thus, section 503(b)(2) provides:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including--
> . . . .
> (2) compensation and reimbursement awarded under section 330(a) of this title[.]

11 U.S.C. § 503(b)(2). Section 507(a)(2) then provides:

> (a) The following expenses and claims have priority in the following order:
> . . . .
> (2) Second, administrative expenses allowed under section 503(b) of this title,

and any fees and charges assessed against the estate under chapter 123 of title 28.

11 U.S.C. § 507(a)(2) (2006).

In a Chapter 13 case, section 330(a)(4)(B) provides that the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case. 11 U.S.C. § 330(a)(4)(B); see also In re Met-L-Wood Corp., 103 B.R. 972, 975 (Bankr. N.D. Ill. 1989). In addition, section 331, in conjunction with Bankruptcy Rule 2016, allows any professional person employed pursuant to § 327 or § 1103 of the Code, to apply to the court for interim compensation and reimbursement. In re Met-L-Wood Corp., 103 B.R. at 975-76 (citing 11 U.S.C. § 331). Moreover, the allowance of a claim for reasonable compensation to the debtor's attorney is an administrative expense, entitled to priority distribution under 11 U.S.C. § 507. See id. at 976. To determine whether to approve an interim compensation application, the court must weigh important competing interests. Ibid. For instance, the primary policy behind the awarding of interim compensation under § 331 is to relieve attorneys from the burden of financing lengthy and complex bankruptcy proceedings. Ibid. (citing In re UNR Indus., Inc., 72 B.R. 796, 798-99 (N.D. Ill. 1987) (Chapter 11)). On the other hand, the court must also weigh the interests of preserving the estate and protecting its various classes of creditors. Ibid. (citing In re Tri-County Water Ass'n, Inc., 91 B.R. 547, 549 (D.S.D. 1988)). It is well-settled that a debtor's attorney is not entitled to compensation from the estate unless his services benefitted the estate. Ibid. (citing In re Ryan, 82 B.R. 929 (N.D. Ill. 1987)).

Here, Debtor's attorneys and valuation experts defended Debtor in a four-day adversary trial that represented one of the largest claims in Debtor's estate. Thus, Debtors' attorneys and their valuation expert are entitled to an administrative expense, entitled to priority distribution under 11 U.S.C. § 507. The only remaining question is the timing of payment of these allowed

administrative expenses.

The Bankruptcy Code does not set forth the appropriate timing of payment of allowed administrative expenses in Chapter 13. See 4 COLLIER, ¶ 503.03. The timing for payment of administrative claims, however, is within the discretion of the bankruptcy court. Varsity Carpet Servs., Inc. v. Richardson (In re Colortex Indus., Inc.), 19 F.3d 1371, 1384 (11th Cir. 1994); Spartan Plastics v. Verco Indus. (In re Verco Indus.), 20 B.R. 664, 665 (B.A.P. 9th Cir. 1982); Journeymen Plasterers Protective & Benevolent Soc'y Local No. v. Energy Insulation, Inc. (In re Energy Insulation, Inc.), 143 B.R. 490, 496 (N.D. Ill. 1992). In considering the timing of administrative claim payments, courts review, inter alia, the following factors: the status of the case; the ability of the debtor to pay present claims; the particular needs of the administrative claimants; and the possibility that future administrative claims may not be paid in full. See, e.g., Verco Indus. (In re Verco Indus.), 20 B.R. at 665; Energy Insulation, Inc., 143 B.R. at 496; In re United West, Inc., 87 B.R. 138, 141 (Bankr. D. Nev. 1988). Minimally, in the Chapter 13 context, courts have authority to order payment of attorney's fees over the life of the debtors' plans, rather than in full before payments to other creditors begin. See In re Lanigan, 101 B.R. 530, 532 (Bankr. N.D. Ill. 1986). In a Chapter 7 proceeding, section 726(a)(1) requires that administrative expenses be paid first upon a distribution of the assets of an estate. See U.S. v. Noland, 517 U.S. 535, 540 (1996); In re Johnson Rehabilitation Nursing Home, Inc., 239 B.R. 168, 180 (Bankr. N.D. Ill. 1999).

In light of the Debtors' recent conversion to Chapter 7, Debtors' attorneys and valuation expert are not entitled to immediate payment of their administrative claims. When the Chapter 7 trustee makes distributions from the estate, then the outstanding administrative expenses, including the compensation from Debtors' attorneys and the Debtors' expert relating to this adversary proceeding, shall be paid, pursuant to 11 U.S.C. § 726(a)(1).

## CONCLUSION

For the foregoing reasons, the Court sustains Plaintiffs' objections to discharge under § 523(a)(6) in Counts I and IV, and overrules Plaintiffs' objections to discharge under § 523(a)(4) in Counts II, III and V. Under the "Ten Percent Agreement," Plaintiffs are entitled to $300,453.04 from ECRM. Plaintiffs are also entitled to the fair market value of Muscarello's 50% ownership interest in ECRM as of December 31, 2006 which equaled $85,185. Therefore, Plaintiffs' compensatory damages are $385,638.04. Plaintiffs' request for punitive damages is denied.

In addition, the compensation for post-petition services in representation of Debtors in their adversary trial from Debtors' attorneys and valuation expert shall be afforded a priority Chapter 7 administrative claim, pursuant to 11 U.S.C. §§ 503(b)(2), 507(a)(2), 726(a)(1), but Debtors' attorneys and valuation expert are not entitled to immediate payment of their administrative claim, and, instead, shall be paid by the Chapter 7 trustee, pursuant to 11 U.S.C. § 726(a)(1).

THEREFORE, IT IS ORDERED that the foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

DATE: June 11, 2009

The Honorable Manuel Barbosa
United States Bankruptcy Judge

## CERTIFICATE OF MAILING

The undersigned hereby certifies that the attached Memorandum Opinion has been served via First Class Mail on June 11, 2009 to:

Abraham Brustein
Dimonte & Lizak
216 W. Higgins Rd.
Park Ridge, IL 60068

James Young
47 DuPage Court
Elgin, IL 60120

Richard G. Larsen
Myler, Ruddy & McTavish
105 E. Galena Blvd., 8th Floor
Aurora, IL 60505

Joseph Voiland
1625 Wing Rd.
Yorkville, IL 60560

William T. Neary
Office of the U.S. Trustee, Region 11
219 South Dearborn St., Rm. 873
Chicago, IL 60604

Mimi Kuczynski, Judicial Secretary